# Exhibit 20

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION TRIBUNAL

TIMBERLINE CONSTRUCTION, INC. and
HIGH VOLTAGE, INC.

        Claimants,                          Case No.: 01-17-0001-9546

v.

SAYERS CONSTRUCTION, LLC

        Respondent.

        _____/

## **REASONED INTERIM ARBITRATION AWARD**

THIS Cause came on for Final Hearing before the undersigned Arbitrator, in Miami, Florida commencing on January 9, 2019 and concluding on January 18, 2019. TIMBERLINE CONSTRUCTION, INC. ("Timberline") and HIGH VOLTAGE, INC. ("HVI")[1] were represented by Timothy C. Ford and Jason L. Molder of Hill Ward Henderson. SAYERS CONSTRUCTION, LLC ("Sayers") was represented by Michael Clark and Jason B. Trauth of Siegfried, Rivera, *et al.* I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated March 2, 2016, and having been duly sworn, having evaluated and determined the relevance, materiality, credibility and value of the evidence offered, and giving due weight to

---

[1] Timberline and HVI are at times collectively referred to herein as Timberline/HVI.

conflicting evidence, I find the following facts were conclusively established by the evidence submitted and the testimony taken at the final hearing,[2] and I make the following Reasoned Award:

## I.      Relevant Background Facts and Findings

1.      Sayers Construction, LLC ("Sayers") is an electrical construction and engineering company based in Texas.  In 2015, Sayers Construction entered into multiple indefinite delivery, indefinite quantity prime contracts with Florida Power & Light ("FPL") to provide construction services related to FPL's storm hardening initiatives for its electric distribution system, which involved strengthening, protecting and otherwise securing the stability of FPL's utility services in both southeast and southwest Florida.

2.      Timberline Construction, Inc. ("Timberline") and High Voltage, Inc. ("HVI") are companies focused on power line related work including both overhead and underground distribution systems based in Rapid City, South Dakota and Vernal, Utah, respectively.

---

[2] Pursuant to Agreed Scheduling and Procedure Order No. 5, the parties presented evidence in an expedited manner. The Arbitrator considered the Affidavits submitted in advance of the hearing and the testimony offered by the following witnesses: Tyler Pratt, Brent Johnson, Dan Reid, Tommy Gore, Doug Lovell, Mark Landguth, William Cain, Steve Sarno, Jimmy Covin, Tom Lutchko, R.J. Moore (via admissions), Shannon Wallen (via admissions), Mark Sayers, and the designated experts Kevin Dennis, Nicholas Krohn, Jared C. Jordan, and Travis Casner.

3.     On or about March 2, 2016, Sayers entered into a subcontract agreement (the "Subcontract") with Timberline, whereby Timberline agreed to complete portions of work on behalf of Sayers in connection with the prime contracts between Sayers and FPL.

4.     Timberline and Sayers were the only signatories to the Subcontract, but Timberline notified Sayers, prior to execution of the Subcontract, that HVI would represent Timberline in connection with the Subcontract, and Sayers was well aware that HVI was performing the work as Timberline's partner in Florida. The Parties have stipulated that while HVI did not execute the Subcontract, its performance of work for Sayers was governed by the terms of the Subcontract.[3]  See *Stipulation of Uncontested Facts and Issues to be Decided by Arbitrator* (the "Stipulation"). The undersigned expressly finds Sayers, Timberline and HVI are all parties to, and bound by, the Subcontract.

5.     The subcontract provided that Timberline/HVI would perform all of the fieldwork as directed in Work Orders (WOs) issued by Sayers and that, upon completion of the work, issue an invoice to Sayers in an "acceptable" form. No further information was provided in the subcontract as to what would constitute an "acceptable" invoice. The subcontract further

---

[3] Sayers staff, including Mark Sayers himself, almost exclusively communicated with representatives of HVI. In addition, Sayers issued all payments for work performed directly to HVI.

provided that Sayers would review the invoice and once "accepted," payment would be made within 45 days.  There was no "pay when paid" or "pay if paid" clause in the Subcontract, and otherwise the payment by Sayers to Timberline/HVI was not conditioned upon payment to Sayers by FPL.

6.    Prior to executing the Subcontract, Timberline's Dan Reed was sent a single-page sample invoice which was represented by Sayers to reflect the billing requirements for the work. The single-page sample invoice was consistent with the express language of the Subcontract. The evidence further shows that Timberline/HVI was told by Mark Sayers at the outset that they were going to be doing fieldwork only, and that Sayers would handle all the back office billing. Given the single-page invoice, the Subcontract, and the representations, Timberline/HVI did not anticipate the need for back office support to handle a very complex, time-consuming and exacting FPL billing and payment process, nor did Timberline/HVI have in their pricing any such back office administrative support.

7.    While Timberline/HVI was completely unaware of the complexities of the FPL billing and payment process, that was not the case with Sayers.  In fact, almost six months before Sayers entered into the Subcontract with Timberline/HVI, it was experiencing difficulty

4

complying with the FPL billing and payment process for its other subcontractors as evidenced by an email written on September 24, 2015 by Mark Sayers to FPL's Mark Depass and Carlos Valderama, among others. *See Depass Deposition Exhibit 101.* Mark Sayers also knew that payments by FPL were typically made as much as 80 days after Sayers completed its invoicing. Notwithstanding, Sayers agreed to pay Timberline/HVI within 45 days of receiving an invoice. And within just a few days of entering into the contract with Timberline/HVI, and well before Timberline/HVI mobilized to the project, on March 5, 2016, Carlos Valderama wrote an email to Mark Sayers, copying another Sayers' subcontractor, Bird Electric, in which Mr. Valderama expressed his frustration that Sayers' subcontractors were communicating directly with FPL on billing and payment issues when FPL would only communicate with its "embedded contractors," in this case Sayers. *See Depass Deposition Exhibit 103.* And in an exchange of emails with FPL on June 6, and 8, 2016, just around the time that Timberline/HVI was sending in its first billing to Sayers, Mark Sayers wrote that Sayers had been in the FPL billing system for two quarters and that it had been a "learning process." And at the end of June and early July 2016, Sayers' billing clerk, Odalys Garcia, and Mark Sayers himself, were complaining to FPL about the slow payment and the difficulty in invoicing. *Depass Deposition Exhibit 106.* Further, with the staff

5

it had, Sayers was having incredible difficulty managing its subcontractors, and completing Work Orders, which had been issued to Sayers months before. *See Depass Deposition Exhibit 105.* Rather than manage the subcontractors it had, and still not explaining any of the complexities and slowness of the FPL billing and payment process, Mark Sayers exhorted and encouraged Timberline/HVI's Tyler Pratt to ramp up and put more men in the field than Timberline/HVI originally anticipated. Sayers' efforts to increase its subcontract workforce, without an increase in field supervision, greatly concerned FPL, as can be seen in email correspondence of July and August 2016. *See Depass Deposition Exhibits 103, 107 and 109.* And by November 2016, FPL was expressing its frustration to Sayers that incomplete job closing packages were being sent in by Sayers' subcontractors and that Sayers was simply submitting them to FPL for payment without ensuring that the packages were complete. *See Depass Deposition Exhibit 112.* As to whose responsibility it was to submit the correct billing packages to FPL, FPL wrote on May 3, 2017 that Sayers' subcontractors should "never been involved in FPL's billing process." And that "Sayers should have had all of this 'figured out' from the beginning and provided the needed oversight." *See Depass Deposition Exhibit 122.* Carlos Valderama, FPL's Dade leader, finally stated, "I know I'm preaching to the choir at this point,

6

but let's keep things clear, the subs are not to be blamed." *Id.* This was in response to an email from Sayers on May 3, 2017, that Sayers' subcontractors, including Timberline/HVI, have "struggled with the FPL billing processes," and that subcontractors, particularly Timberline/HVI " have actually given up as seeing that the overhead costs and frustrations to invoice the work at this point may exceed the actual worth of the invoice itself." He references that Timberline/HVI has invoiced $2 million worth of work, but that they claimed $4 million in work done. *Id.*

8.      Notwithstanding the fact that the Subcontract did not require Timberline/HVI to comply with the FPL billing processes, and I find quite to the contrary, on May 24, 2016, Sayers' office manager, Olga Rivera, outlined documentation that she said Sayers needed Timberline/HVI to provide in order that she could submit an "acceptable" invoice to FPL. *Respondent's Exhibit 7.*    This was referred by her as a "closing job package," and specified what FPL required be submitted by Sayers in order to be paid for the work, to wit:  FPL adder forms for extra work called CNCs; as-builts, signed and dated; non-unit charge forms (NUT forms); closed balance of materials (BOMs forms); any pictures of the jobs that might be required; and, finally, an invoice.  And while Sayers contends that this was a requirement of the Subcontract, the Subcontract never included any such requirements in it even though Sayers

knew of these requirements at least six (6) months before it entered into the Subcontract. Ms. Rivera's email, even if it was intended to be a Subcontract modification, is not a legal modification of the Subcontract.[4]    Further, in an email of November 22, 2016, from R.J. Moore, a newly hired executive vice president of Sayers, to Mark Depass of FPL, Mr. Moore writes that Sayers had hired a dedicated employee to deal with balance of material (BOM) issues and a contract unit writer and contract WMS[5] specialist to help Sayers improve its billing and close out processes. This email clearly evidences that Sayers knew the responsibility to complete the "job closing packages" was its, not Timberline/HVI's.    Mr. Moore further admits that he was "cleaning out AR reports" and submitted hundreds of requests to FPL in an effort to "bill jobs that were left to rot on the proverbial vine." *See Depass Deposition Exhibit 113*. FPL certainly expected that it was Sayers' responsibility to have sufficient people in the field to ensure that any changes in scope were identified and documented, and to complete NUT and CNC forms as required. It was Sayers' field personnel who were to accomplish that documentation, and not the subcontractors. *See Depass Deposition, pg. 37, lines 15-23; pg. 96, Lines 13-17.*

---

[4] Under Texas law the contract has to be modified by separate consideration. *Williams v. Colt Hurst,* 253 S.W. 3d 353 (Tex. App. – Eastland 2008, no petition).

[5] WMS is FPL's work management system, by which billing has to be submitted online into the FPL system and to which Sayers had exclusive access to enter billing.

8

9.      My finding that the responsibility to complete the "job closing packages" was Sayers' alone is further supported by the evidence presented both at the hearing and by affidavit from Sayers' field supervisors, Tommy Gore and Tonni Herring, who contradicted Mark Sayers' testimony of what Timberline/HVI was required to submit by way of an invoice. Neither gentleman ever used the words "accepted" or "approved" invoicing, and they established less formal billing procedures which Timberline/HVI followed. Further, the evidence shows that, in many instances, Sayers actually invoiced FPL for work performed by Timberline/HVI without ever having received an invoice from Timberline/HVI, and sometimes well in advance of receiving Timberline/HVI's invoice

10.     From April 2016 through March 2017, Timberline/HVI performed work for Sayers pursuant to the Subcontract. Timberline/HVI's work for Sayers on the East Coast of Florida comprised primarily overhead projects, whereas the West Coast work was primarily underground. In addition to the hardening work, Timberline/HVI performed restoration work necessitated by various storms, and rework to correct work of Sayers' other subcontractors. All work orders other than those for rework, takeover work, and lump sum work were to be paid based on percentage complete, using calculated man-hour unit rates, plus any additional FPL-

approved overages and changes. In addition to new work orders, Timberline/HVI was also asked from time to time to perform what has been referred to by the parties as "takeover" work, which was defined generally as work begun by another subcontractor that Timberline/HVI was asked to complete.

11. Timberline/HVI claims that it was to be paid for the takeover work on an hourly basis, but Mark Sayers testified that the payments were subject to the same man-hour unit rates which applied to all of the other work. Tommy Gore, Sayers' field representative, testified to the contrary, that this work was to be paid on an hourly basis. Sayers also claims that because of advances that it made to Timberline/HVI and "over invoicing," resulting from the partial billing program initiated by Sayers (and the confusion it created for Sayers' billing clerk, Ms. Taisha Brown), proves that Sayers was not owed any money as of December 11, 2016. First, aside from the West Coast invoices, which were not ever paid, the confusion created in Timberline/HVI's staff was a consequence of Sayers not paying invoices within forty-five days of receiving them, as the Subcontract required, and Sayers' waiting for payment by FPL before it paid Timberline/HVI. As stated above, there was no "pay when paid" or "pay if paid" provision in the Subcontract, so there should have been no need for partial billing in the first place and Sayers

10

had no justification to wait for payment by FPL before it paid Timberline/HVI because Sayers

had contractually agreed otherwise.    Secondly, although Mark Sayers testified that the

"advances" came from his own funds, an email that Mark Sayers wrote on November 1, 2016 at

9:19 AM, *Exhibit B* to HVI's Pre-Hearing Memorandum, states that he was using funds from the

Bird and Isolux payments to pay Tyler Pratt to "tie him over," after Pratt sent an email on

Thursday, November 3, 2016, saying that he needed to receive $400,000 to $500,000 by Monday

or Tuesday of the following week in order to keep his men and equipment on the project.

Additionally, Mark Sayers admitted in an email of November 23, 2016 at 3:27 AM to his new

Executive Vice President, RJ Moore, that Sayers had "over $10 million in work completed and

not paid … and six months of gross negligence." *Id.*    RJ Moore responded that same day to

Mark Sayers:

> *"you cannot expect me to clean a year's worth of poorly managed process when I had to learn the current process and do not even have WMS access to investigate yet. In addition, I have a field staff that doesn't check email AND only have one quarter of the manpower we originally had. We simply do not have the resources and you quite frankly ignored this for FAR too long for me to change the entire culture, deal with the operational issues that Tommy and Tonni will not address, and clean the AR mess that we have … ."*

He concluded by saying that:

11

> *"this is a mess we allowed to happen for FAR too long and you've hired me to clean it up. I fear that it may be worse that you could possibly know."*

*Id.* (emphasis in original).

I therefore find that the "billing mess" and the lack of timely payment by FPL was the fault of Sayers and Sayers alone.

12.     Aside from minor invoicing corrections, Sayers did not dispute Timberline/HVI's invoices during the course of the work,[6] nor was any evidence presented to show that Sayers took steps to identify and pay undisputed amounts. For example, the evidence presented confirmed that virtually all of the West coast work was properly performed and invoiced by Timberline/HVI, specifically $700,000 of West coast invoices by December 2017, none of which was formally disputed or paid (in whole or in part) by Sayers. Further, Sayers offered no evidence that any of the work performed by Timberline/HVI was defective, deficient, or unsatisfactory.[7]

---

[6] Excepting the invoices submitted by Timberline/HVI in March and August of 2017, which are discussed *infra.*

[7] Pursuant to ¶28 of Agreed Scheduling and Procedure Order No. 5 dated December 3, 2018, all claims, damages, causes of action arising out of or relating to WO 67000895 were excluded from these proceedings, which may contain claims involving defective, deficient, or unsatisfactory work. Other than some rework and completion issues identified in issues 9 and 10 below, Respondent did not raise any other workmanship concerns.

12

13.     For all the reasons above, I find that Timberline/HVI invoiced Sayers in accordance with the terms of the Subcontract and as directed by Messrs. Gore and Herring. While some invoices required minor corrections, the evidence and testimony revealed that such minor corrections were promptly addressed by Timberline/HVI when identified, and resulted in no prejudice to Sayers. Aside from Sayers' contention that invoices failed to contain necessary backup documentation and approvals, I find that the back-up documentation and approvals were not Timberline/HVI's responsibility and that any minor invoice corrections were immaterial and were accepted and therefore excused by Sayers. Further, Sayers' failure to object to invoicing and to continue to require performance, despite Timberline/HVI's alleged improper invoicing, deprived Sayers of any excuse to cease performance,[8] particularly to be paid for continued performance.

14.     As of December 10, 2016, Timberline/HVI was owed $2,819,658.47 for amounts properly invoiced to Sayers. Despite the foregoing, as of that same day, Sayers had only paid

---

[8] Avasthi & Associates, Inc. v. Dronamraju, 01-11-00786, 2012 WL 6644873 (Tex. App. – Houston 1st Dist. December 20, 2012, pet. denied) (when non-breaching party continues to assign work to a breaching party despite deficiencies in invoicing, the non-breaching party conclusively elects to continue performing and is deprived of any excuse to cease performing).

Timberline/HVI $2,502,971.86.  As a result, the Arbitrator finds Sayers materially breached the Subcontract due to non-payment, at the latest, on December 11, 2016.[9]

15.    As of December 11, 2016, as a result of Sayers' material breach of the Subcontract, Timberline/HVI was excused from further performance under the Subcontract. [10]

16.    Timberline/HVI ceased performing work for Sayers in early March, 2017.[11]  The evidence reflects that, had Sayers not first breached the Subcontract, Timberline/HVI would have continued to perform work for Sayers.

---

[9] Under Texas law, when one party materially breaches a contract the non-breaching party is excused from further performance.  Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc., 134 S.W.3d 195, 196 (Tex. 2004).  Trans-Pecos Resources, Inc. v. Range Production. I, L.P., et. al., 09-01-372CV, 2002 WL 31322647 (Tex. App. – Beaumont 2002, pet. denied, not designated for publication); Texas Bank & Trust Co. v. Campbell Brothers, Inc., et. al., 569 S.W.2d 35 (Tex. Civ. App. – Dallas 1978, writ dism'd).

[10] Sayers' failure to pay for the work that Timberline/HVI performed on the West Coast was a prior breach of the Subcontract *even before December 11, 2016*, and would have excused Timberline/HVI from any further performance.  However, there is no clear individualized date of breach for nonpayment on the West Coast invoices, so the more global date of December 11, 2016, which is likely later in time, is used here.  In addition to finding that there was a breach by Sayers as of at least December 11, 2016, it is clear from the evidence that Sayers knew that it was in breach of contract.  An email of November 16, 2016, from Mark Sayers to RJ Moore states that Sayers was going to protect itself and cut off the funding to its subcontractors, which Sayers expected would walk on it in three to four weeks.  Sayers mentions not only existing claims for nonpayment with Isolux and Bird, who had already left the project, but new claims with existing subcontractors like Timberline/HVI.  He exhorted Moore to get all the work documented as to what had been performed to date and to bill FPL.  He finally told Moore that they needed to keep this to themselves and that the subcontractors "will figure it out in a few weeks, but in the meantime keep everyone moving and thinking everything is okay."  See *Exhibit B* of HVI's Pre-Hearing Memorandum.

[11] Sayers takes the position that Timberline/HVI's cessation of work was itself a breach of the Subcontract because Timberline/HVI was allegedly required to provide Sayers with sixty (60) days' notice prior to any such termination.  I reject this position for the following reasons: (a) the reference to sixty (60) days' notice in the Subcontract pertains only to the routine non-renewal of the Subcontract, and not a termination in the event of a party's default: and (b) by the time Timberline/HVI ceased performing work in March, 2017, Sayers had already materially breached the Subcontract due to non-payment which excused further performance, including notice of nonrenewal within 60 days.  See cases cited in Fn. 8.

17.    In March and August, 2017, Timberline/HVI invoiced Sayers for work performed by Timberline/HVI prior to its demobilization in March, 2017, but which was previously unbilled to Sayers.  I find that Timberline/HVI is entitled to be paid for this unbilled work consistent with its March and August 2017 invoices, with the exception discussed *infra*.

18.    Pursuant to the Stipulation:

a.    Timberline/HVI invoiced Sayers $10,672,568 for HVI's work in connection with the FPL project;

b.    Sayers paid Timberline/HVI $2,803,544 against HVI's total invoiced amount;

c.    The parties have agreed to an undisputed adjustment totaling $92,481; and

d.    As a result, the parties stipulate that Timberline/HVI has pending unpaid invoices totaling $7,776,543.[12]

## II.    Findings on Stipulated Issues to be Decided by the Arbitrator

The parties stipulated to certain facts,[13] and jointly identified twelve (12) issues to be decided by the undersigned in this matter.  I find as follows with respect to each issue, some of which are grouped together based on similar findings:

---

[12] As to which any adjustments are to be made.

A.    **Issues 1 and 2: Invoices submitted to Sayers in August of 2017 and invoices allegedly not received.**

Sayers seeks a combined adjustment against (i) 34 pending Timberline/HVI invoices submitted in August of 2017, and (ii) 17 invoices that it claims to never have received. The evidence reflects Sayers billed FPL at least 13 of the 34 August 2017 invoices prior to receiving invoices from Timberline/HVI, and received payments of over $600,000 from FPL on those invoices,[14] which it never paid, in whole or in part, to Timberline/HVI. Sayers billed FPL for 8 of the 17 invoices it alleges it never received, and FPL made payments to Sayers towards all of the 8 billed invoices, no portion of which did Sayers pay to Timberline/HVI. Despite being paid by FPL, Sayers maintains that Timberline/HVI is not entitled to *any* payment on *any* of these invoices. Sayers' position is contrary to the evidence. In emails dated April 4, 2017 (*Depass Deposition Exhibit 121*) and May 3, 2107 (*Depass Deposition Exhibit 122*), Sayers admitted that Timberline/HVI had invoiced over $2.2 million which Sayers admitted had yet to be funded by FPL; Sayers acknowledged that Timberline/HVI claimed to have roughly $4 million in work completed in the field, and that Sayers was attempting to assist Timberline/HVI in generating invoices, through a consultant, who was helping them produce as-built drawings and forms FPL

---

[13] The Arbitrator hereby incorporates all facts stipulated by the parties in the Stipulation into this Award.

[14] Sayers did not even attempt to bill FPL for 19 of the 34 August 2017 invoices.

16

required. The evidence shows that Timberline/HVI performed the work included in the invoices it submitted, as directed by Sayers, and that Sayers received the benefit of such work. If Sayers did not get paid for all of this work by FPL, the fault lies with Sayers in failing to have adequate staff in the field to complete and have approved NUT and CNC forms, and to otherwise complete the closing job packages which I find was the responsibility solely of Sayers. Furthermore, where a breaching party alleges that the other party subsequently failed to comply with contractual notice or documentation requirements, Texas courts have consistently held that such obligations were extinguished upon the initial material breach. Levco Construction, Inc. v. Whole Foods Market Rocky Mountain/Southwest, L.P., et. al., 549 S.W.3d 618 (Tex. App. – Houston 2017) (Whole Foods' material breach of the construction contract by failing to make final payments excused subsequent breach by contractor in failing to obtain lien releases from its subcontractors).

Therefore, the deductive adjustments sought by Sayers in Issues 1 and 2 are rejected.

**B.      Issues 3, 4, and 5: Claims that Timberline/HVI did not provide closing job packages, invoiced amounts in excess of FPL approved amounts, and third-party amounts and NUT not approved by FPL.**

17

Sayers seeks a deductive adjustment for invoiced amounts for work that was (i) pre-approved by FPL but was not final approved by FPL due to outstanding billing documentation; (ii) in excess of FPL approved amounts; and (iii) for third-party invoices (e.g., traffic control, restoration) and non-unit time (NUT) (delay/switching/premium time, etc.) not approved by FPL. Sayers claims it did not receive final approval from FPL for these invoiced amounts and therefore has no obligation to pay Timberline/HVI for these amounts. Payment to Timberline/HVI is not contractually conditioned on approval by FPL. Moreover, Timberline/HVI invoiced Sayers in accordance with the Subcontract, which included corresponding backup documentation as directed by Messrs. Gore and Herring. While Timberline/HVI assisted Sayers in the preparation of closing job packages in order to get paid, there was never an obligation, contractual or otherwise, that Timberline/HVI perform Sayers' billing requirements to FPL, including the preparation of closing job packages. The Subcontract did not require completed closing job packages as a condition of payment; and Messrs. Gore and Herring never required completed closing job packages as a condition of payment, confirming the respective contract obligations of the Parties. Timberline/HVI had no contractual obligation to provide Sayers with completed closing job packages and Timberline/HVI is entitled to full

payment for all work performed regardless of whether a closing job package was completed by Timberline/HVI or not provided to Sayers. Similarly, the evidence shows that it was Sayers' responsibility to obtain approval from FPL for additional man-hours, changes in scope, and third-party invoices and NUT. While Timberline/HVI, in a desperate attempt to receive payment, attempted to obtain approval from FPL of NUT forms, and on many occasions completed CNCs and BOMs, Sayers was ultimately responsible for obtaining the necessary approvals from FPL and its failure to do so does not relieve Sayers of its obligation to pay Timberline/HVI for work performed. Timberline/HVI's actions do not modify the Subcontract. Furthermore, a significant portion of these adjustments relate to takeover work, which Sayers agreed to pay on an hourly basis regardless of FPL approvals according to Mr. Gore.[15] No evidence has been offered by Sayers to show that Sayers ever advised Timberline/HVI prior to Sayers' breach of the Subcontract that Timberline/HVI was not following the proper process for the assignment, documentation, and invoicing of work, or that Timberline/HVI was not otherwise complying with Sayers' instructions. To the contrary, the evidence reflects that Messrs. Gore and Herring worked hand-in-hand with their Timberline/HVI counterparts, Messrs.

---

[15] I find that Sayers and Timberline/HVI agreed that Timberline/HVI would be paid a combined agreed-upon hourly rate of $117.00 per hour for labor and equipment for all rework and takeover work, plus reimbursable expenses and third party costs

19

Lovell and Johnson, to prepare backup documentation and invoicing. Messrs. Gore and Herring never disputed or objected to Timberline/HVI's invoicing procedures, and such objections by Sayers were only raised by Sayers as an excuse to justify non-payment after it breached the Subcontract.[16] The testimony reflects Timberline/HVI completed redlined as-built plans for the work it performed, which were provided to Sayers. This information, if properly handled by Sayers, would have enabled Sayers to bill FPL for the work performed, even if provided late since FPL agreed to pay Sayers for its work beyond Sayers' own proscribed FPL submission deadlines. The undersigned finds in favor of Timberline/HVI on these issues, and that Timberline/HVI is entitled to full payment for the work performed and included in its invoices, and rejects the corresponding deductive adjustments sought by Sayers in Issues 3, 4 and 5.

C.    **Issue 6: Invoiced amounts for work performed by a previous subcontractor.**

Sayers seeks an adjustment against Timberline/HVI invoices in connection with takeover work that was previously assigned to and partially completed by other subcontractors who had also submitted invoices to Sayers. As discussed above, Sayers agreed to pay Timberline/HVI on an hourly basis at an agreed-upon rate for all takeover work. This work was not subject to FPL

---

[16] There is also no evidence of improper performance of work by Timberline/HVI. *See Depass Deposition, pg. 134, lines 6-16.*

approved amounts, or any deductions for work previously performed and billed by previous subcontractors. To the contrary, evidence indicated Sayers' intent to back charge previous subcontractors for work completed by takeover subcontractors like Timberline/HVI. Accordingly, Timberline/HVI is entitled to full payment for all takeover work performed, regardless of the FPL approved amounts or the amount billed by previous subcontractors. For the reasons set forth above, adjustments for Issue 6 are rejected.

## D.    Issue 7: Incorrect unit rates and quantities.

Sayers seeks an adjustment for (i) alleged incorrect unit quantities for West Coast underground work orders; (ii) an alleged improperly applied 10% increase to unit rates for West coast underground work orders; and (iii) CMH amounts, third-party, rework rate, PIP units, storm units, etc. With respect to the 10% increase for West Coast work, Timberline/HVI cites to the evidence that Tonni Herring verbally agreed to the 10% increase in West Coast work during an in-person meeting with Tyler Pratt and Brent Johnson. Mark Sayers testified the rate increase was tied to a corresponding rate increase from FPL that did not occur. The verbal representations are not sufficient to modify the Subcontract and, therefore, I find that Timberline/HVI is not entitled to the 10% rate increase included in Timberline/HVI's invoicing,

21

and consistent with Paragraph 15 of the Parties' Stipulation, the amount of $174,527 is disapproved. Regarding alleged incorrect unit quantities and CMH amounts, the evidence shows that the initial pre-approved CMH amount was a baseline, and did not represent the total number of CMH that would ultimately be required to perform the work and be approved by FPL. Sayers provided Timberline/HVI with information regarding the amount of increased CMH that FPL would actually approve for any given project. Timberline/HVI provided information regarding these adders to Sayers in the form of red-lined as-built prints that documented the work. The evidence clearly reflects that Timberline/HVI performed the work and documented it according to the instructions provided by Messrs. Gore and Herring and is therefore entitled to payment for such work. Finally, all PIP (which was takeover work), and rework, was to be billed and paid on an agreed-upon hourly basis at the rate of $117.00 per hour. This hourly work was not subject to pre-approved FPL amounts, and (for PIP) was not subject to per-pole billing. For the reasons set forth above, the adjustment in Issue 7 is rejected except as to the 10% increase.

### E.    Issue 8: Backcharges for third-party invoices.

Sayers claims that it incurred costs paid to Timberline/HVI's third-party vendors, as well as repair costs for property damage allegedly caused by Timberline/HVI, and seeks a reduction

22

of Timberline/HVI's claim for such amounts. Despite its claim, however, Sayers failed to present evidence of any such payments. Moreover, the evidence reflects that in some cases FPL reimbursed Sayers for these third-party vendor costs. Sayers informed Timberline/HVI that it would pay Timberline/HVI's third party vendors directly. At that point, the burden was on Sayers to procure reimbursement from FPL for the third-party vendor costs rather than simply backcharging Timberline/HVI. Not until the arbitration did Sayers provide Timberline/HVI with notice that it was seeking recoupment for alleged third-party vendor payments. Finally, evidence offered indicates Timberline/HVI submitted invoices to Sayers for over 90% of the third-party vendor amounts that Sayers seeks in this adjustment, and Sayers never paid those invoices. As a result of Sayers' failure to properly pay Timberline/HVI's invoices (which included third-party costs), HVI testified it is still liable for over $1.3 million in third-party costs it could not pay as a result of Sayers' material breach for non-payment. For the reasons set forth above, Sayers is not entitled to adjustments for third-party invoices reflected in Issue 8.

**F.    Issues 9 and 10: Backcharges for costs to complete and for amounts unable to be allocated to a specific work order.**

Sayers seeks a combined adjustment for costs allegedly incurred by Sayers to complete work orders assigned to Timberline/HVI that were not completed as of the date Timberline/HVI

ceased work and demobilized in March of 2017. As stated above, Sayers' material breach of the Subcontract excused further performance by Timberline/HVI, which includes amounts allegedly incurred by Sayers to complete the work. Having committed a prior breach of the Subcontract, Timberline/HVI was legally permitted to cease performing work, and any costs incurred by Sayers in completing Timberline/HVI's work were solely the responsibility of Sayers. To hold otherwise would penalize Timberline/HVI for Sayers' breach. Accordingly, Sayers is not entitled to the adjustments set forth in Issues 9 and 10.

### G.    Issue 11: Offsets related to Takeover Work Requests.

I have determined that Sayers is obligated to pay Timberline/HVI the agreed-upon hourly rate in the amount of $117.00 per hour, for labor and equipment, for all rework and takeover work, plus reimbursable expenses and third party costs. This issue is therefore moot. Sayers has failed to demonstrate that Timberline/HVI's invoiced amounts, including takeover work, should be reduced, except for the disallowed 10% fee increase.

### H.    Issue 12: Breach of contract.

The parties have asserted competing breach of contract claims for various damages. The Arbitrator finds that Sayers breached the Subcontract for nonpayment as of December 11, 2016,

long before Timberline/HVI demobilized, and that Timberline/HVI did not previously commit a material breach of the Subcontract. As a result of Sayers' material breach of Subcontract, the Arbitrator finds Timberline/HVI is entitled to recover from Sayers non-compensated damages proximately caused by Sayers' material breach of the Subcontract, which are identified below.

## IV.    DAMAGES

I find Timberline/HVI incurred damages as a direct and proximate result of Sayers' material breach of the Subcontract. As stipulated by the parties, Timberline/HVI invoiced Sayers in the total amount of $10,672,568, against which Sayers paid $2,803,544. The parties further stipulated to $92,481 in undisputed deductive adjustments to the invoice balance, leaving a total stipulated unpaid balance due Timberline/HVI of $7,776,543, less $174,527 for the 10% increase, or an adjusted balance of $7,602,016. I find that Sayers is not entitled to any adjustments against this adjusted unpaid balance. I do find, however, that Timberline/HVI is not entitled to recover consequential damages for Sayers' breach of the Subcontract in the amount of $550,886,[17] as such damages are not foreseeable. Timberline/HVI is entitled to demobilization costs of $89,441, as those damages are direct and foreseeable. Total damages thus awarded to

---

[17] This claim totals $640,327, and is comprised of IRS penalties and interest in the amount of $550,886, which was disallowed; and demobilization costs in the amount of $89,441, which I find are direct and recoverable damages.

25

Timberline/HVI are $7,691,457, exclusive of pre-award interest and attorneys' fees.

Timberline/HVI is entitled to pre-award interest from the date of breach, at the rate of 5% annually through October 21, 2018, and 5.25% thereafter until February 25, 2019, in the total amount of $857,197.50.[18]  Accordingly, the undersigned awards Timberline/HVI total damages in the amount of $8,548,654.50,[19] for which it is entitled to recover against Sayers.

I further find Timberline/HVI is the prevailing party in this arbitration.  As a result, Timberline/HVI is additionally entitled to recover from Sayers its legal fees[20] and costs, including costs paid to the American Arbitration Association, consistent with the agreement between the parties in the Subcontract and as stipulated in ¶23 of the Agreed Scheduling and Procedural Order No. 5, dated December 3, 2018.  Regarding a procedure for establishment of the amount of legal fees and costs to be awarded as the Parties stipulated, Timberline/HVI is hereby directed to submit to the undersigned for an *in camera* review, supporting documentation

---

[18] Calculated as follows:  680 days at 5% or $716,536.13 and 127 days at 5.25% or $140,661.37.

[19] Not including attorneys' fees and costs.

[20] In Sayers' proposed Reasoned Award, it argues that attorneys' fees are not recoverable in this action.  It argues that arbitration is not a "legal proceeding" under Texas law, unless specifically provided by contract or statute. Sayers next argues under the Texas Civil Practice and Remedies Code a limited liability company is exempt from an award of attorneys' fees.  Finally, it argues that Rule 48 of the AAA Construction Rules allows the arbitrator in his or her discretion to award attorneys' fees where both parties have requested the award, as in both the demand and counterclaim in this action, but that such discretion should not be exercised because of Timberline/HVI's alleged interference with FPL and alleged intentional withholding of invoices.  I find these arguments unavailing and reject them. The Parties both claimed attorneys' fees and costs in the Claim and Counterclaim pursuant to the Subcontract. The cases cited would not apply.  Furthermore, in Paragraph 23 of Agreed Scheduling and Procedural Order No. 5, "the parties agreed at the Preliminary Hearing pursuant to Rule R-57 to allow the Arbitrator to rule on the allocation of deposits and the prevailing party an award of legal fees and costs."

26

for its legal fees and costs in the form of invoices, accounting records, and related costs, expert fees and costs, for which Timberline/HVI is seeking recovery as the prevailing party. Counsel for Timberline/HVI is directed to provide this information, in redacted form, to counsel for Sayers. After submission, the parties are directed to negotiate and attempt to reach agreement on Timberline/HVI's prevailing party legal fees and cost award. The parties may, but are not required to, mediate this matter. If the parties do not agree on the amount of legal fees and costs to be awarded Timberline/HVI within thirty (30) days from the date of this Award, or otherwise fail to schedule a mediation within that time, I will review the submitted documentation and, in my sole discretion, issue a second award as part of this proceeding covering Timberline/HVI's prevailing party legal fees and costs within sixty (60) days from the date of this Award. I reserve the right to request additional information from both parties, including the amount of Sayers' legal fees and costs relating to this proceeding, and to schedule a separate hearing, if necessary in my sole discretion, to issue a second award for Timberline/HVI's prevailing party legal fees and costs.

Timberline/HVI, as the prevailing party, is also entitled to post-award interest as a matter of law.  Accordingly, this Award shall bear interest at the rate of 5.25% per annum from February 26, 2019, until satisfied.

Finally, by agreement the Parties, excluded claims, damages, and causes of action arising out of or relating to WO 67000895, have not been decided and are not included in this Award.[21] See Agreed Scheduling and Procedure Order No. 5 dated December 3, 2018, ¶28.  I expressly reserve jurisdiction to decide Timberline/HVI's pending payment claim against Sayers relating to WO 67000895, as well as any backcharge or set off claims by Sayers arising from FPL or otherwise.  Timberline/HVI is directed to notify the AAA and me if it intends to pursue such claims, and any such proceeding is deemed a continuation of this proceeding and shall be subject to the same procedures, orders, stipulations, evidence and findings reached by me in this proceeding.[22]

---

[21] Counsel for the Parties and the Arbitrator will have a status conference call within 45 days to discuss a schedule as to when this claim will be ripe for resolution and a Scheduling Order for resolution of this claim will be entered.

[22] Sayers claimed damages for incomplete or required rework, additional Sayers' personnel to prepare billing documentation, cost related to clean up of HVI's yard, etc., are premised upon HVI abandoning the work and I find that HVI was excused from performance due to the prior breach by Sayers.  Likewise, Sayers' additional expenses and equipment rental and training for subcontractors to complete the Timberline/HVI Work Orders is not recoverable, nor is Sayers' additional cost for interest expenses on advances made to Timberline/HVI, for the reasons stated in the opinion and for the reason that the "advances" were for work performed and for which Timberline/HVI was entitled to payment.  Sayers also made a claim for lost profits of $846,086 due to HVI's alleged interference with Sayers' contracts with FPL.  However, the evidence does not support such an award.  Mark Depass testified that FPL made the decision to terminate Sayers as of November, 2016, long before any contact between

28

## AWARD

Based upon the foregoing, I hereby enter an interim award in favor of TIMBERLINE CONSTRUCTION, INC. and HIGH VOLTAGE, INC., jointly and severally, and against SAYERS CONSTRUCTION, LLC:

(1) in the amount of $8,548,654.50, plus attorneys' fees and costs in an amount to be determined and included in a later-issued award, subject to post-award interest at the rate of 5.25% per annum from February 25, 2019, until satisfied;

(2) The administrative fees of the American Arbitration Association to the date of this Interim Award totaling $29,400.00 and the compensation and expenses of the Arbitrator totaling $78,341.23 to the date of this Award, are to be borne 100% solely by Sayers. Therefore, Sayers has to pay Timberline/HVI an additional amount of $53,870.62.

(3) For a total Interim Award of $8,602,525.10, which Sayers Construction, LLC has to pay Timberline Construction, Inc. and High Voltage, Inc.

---

Sayers and FPL. *See Depass Deposition, pg. 124, lines 23-25; pg. 125, lines 1-3.* Furthermore, this was known by Mark Sayers. In an email to Mark Depass from Mark Sayers of November 20, 2016, Sayers asked if it was definitely being terminated by FPL. *See Depass Deposition Exhibit 123.* Finally, as Mark Depass testified, there was never a guarantee that any embedded contractor would receive work from FPL, which could assign work at its sole discretion. *See Depass Deposition, page 46, lines 20-25; page 47, lines 1-2.* Thus, any loss of profits is speculative.

This Interim Award is in full settlement of all claims and counterclaims submitted to the Arbitrator to date, and except as otherwise noted. Any issue, claim, or counterclaim not specifically addressed herein is deemed denied. The Arbitrator retains jurisdiction to award additional administrative fees and expenses, along with legal fees, for the disposition of WO6700895 which, by Stipulation of the Parties, will be decided later and is not decided in this Award.

IT IS SO ORDERED.

Dated this 25th day of February, 2019.

_____
John S. Vento, Arbitrator
American Arbitration Association

30